James F. Patton v. Commissioner. Vincent Patton v. Commissioner.
Patton v. Commissioner
Docket Nos. 10275, 10276.
United States Tax Court
1947 Tax Ct. Memo LEXIS 223; 6 T.C.M. (CCH) 482; T.C.M. (RIA) 47119; April 30, 1947
L. F. Loux, Esq., 1000 N.B.C. Bldg., Cleveland, Ohio, for the petitioners. Howard W. Kohn, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: These cases, which were consolidated, involve the income and victory tax liabilities of the above named petitioners for the taxable year 1943. The asserted deficiencies are $16,561.12 in the case of James F. Patton, and $16,361.80 in the case of Vincent Patton. The returns of the petitioners were filed with the collector of internal revenue for the 18th district of Ohio at Cleveland, Ohio. The question involved is as to whether or not compensation paid by petitioners, who were partners, to one William Kirk in the amount of $37,949.40 in 1942 and $46,049.41 in 1943, constituted necessary and reasonable business expenditures of *224 the partnership for the taxable years in which said compensation was paid. The Commissioner determined that in each year $13,000 was reasonable compensation to William Kirk for the services rendered. Findings of Fact In 1942 and 1943 petitioners were partners operating a general jobbing machine shop under the firm name and style of Patton Company. The partnership was formed on July 1, 1940. Prior thereto James F. Patton had operated the same business as an individual. Vincent Patton is the son of James F. Patton. About 1937 James F. Patton employed one William Kirk to conduct his office work. Kirk had a grammar school education plus a two year's commercial course in high school. He had been generally engaged in clerical work since 1893 up to 1919 when he operated a small trucking business which lasted until 1929. From 1929 until his employment by James F. Patton in 1937 he had no regular employment. From 1919 until 1941 his annual earnings had not been sufficient to necessitate the filing of income tax returns. Kirk's compensation from 1937 to 1940 was approximately as follows: 1937
$ 933.00
1938
1,230.00
1939
1,385.00
1940
1,855.00
Shortly after the *225 formation of the partnership between James F. Patton and Vincent Patton, James F. Patton discontinued his active connection with the business and turned the affairs of the partnership over to Vincent Patton. Up to December 17, 1940, the Patton Company had done job work for such customers as sought their services. On December 17, 1940, the General Motors Corporation began sending work to Patton Company to such an extent that substantially the entire productive capacity of Patton Company was absorbed by this one customer. During the period 1937 to 1939, James F. Patton's business was small. At times he had no employees in the shop; all of the work he had he did himself. At other times, when he had more work, he hired the men he needed. For a time Vincent Patton was assisting his father when the work required it, in addition to holding a full-time job elsewhere. Sometime prior to 1939, Vincent Patton left his other employment and began working full time for his father. On January 2, 1941, petitioners herein entered into a written contract with William Kirk whereby Kirk was to receive a minimum salary of $2,400 a year until such time as 22 1/2 per cent of the net profits of the partnership *226 exceeded $2,400. When this occurred the contract provided that Kirk was to receive ten per cent of the net sales of the company so long as said ten per cent commission, plus the $2,400 minimum basic salary did not exceed 22 1/2 per cent of the net profits of the company. The gross sales of the company from 1941 to 1943 were as follows: 1941
$179,050.09
1942
365,609.53
1943
460,494.06 Substantially all of these sales represented purchases by General Motors Corporation. During the taxable years, Kirk's services consisted of keeping such books and records as the Patton Company had, and rendering such other clerical, and for the most part routine, services as the office work required. He generally worked without assistants. He kept the books of the company on a cash basis, in a simple way, recording all receipts and disbursements in a cash book and, at the end of each month, preparing two summary sheets, one showing total receipts and totals of each class of disbursements, also one showing materials purchased. At the end of each year, the summary sheets, showing totals for each month and for the year, were used by an accountant, who translated them to an accrual *227 basis for the preparation of income tax returns. Kirk kept a ledger and did the billing, but since substantially all of the company's work was for one customer, those duties entailed little effort. He prepared the payroll, kept social security records and prepared social security reports quarterly, kept Vincent Patton informed of the company's current bank balance, and transmitted to shop foremen information received from General Motors as to which orders or parts they desired be finished first. He spoke to insurance salesmen who called on the company but purchases of any insurance were approved by Vincent Patton before they were made. About five times in 1942 and 1943, he called upon the appropriate agency to obtain approval for wage increases for the employees of the company. The partnership claimed deductions for compensation to Kirk as follows: 1942
$37,949.40
1943
46,049.41
The Commissioner determined that $13,000 each year constituted a reasonable compensation for the services rendered by Kirk and disallowed the remainder of the deduction claimed. The compensation determined by the Commissioner is reasonable and the amounts in excess of $13,000 per year, *228 claimed as deductions representing sums paid to Kirk, were not ordinary and necessary expenses and were properly disallowed. Opinion Petitioners contend that since the compensation paid to William Kirk was the result of an enforceable bona fide contract entered into prior to the taxable year, since there is no question in this case of the diversion of corporate dividends under the guise of salary, nor the use of salary payments to cover payments for any other undisclosed purpose, and since Kirk was not related in any way to either of the taxpayers, the reasonableness of the salary deductions claimed by the taxpayer can only be questioned when the Commissioner has established through evidence which he introduced that such salaries are unreasonable. We are unable to follow petitioner's reasoning in this case. Section 23(a) (1) (A), I.R.C.[1] allows a deduction of ordinary and necessary expenses, including a reasonable allowance for salaries or other compensation for personal services actually rendered. The reasonableness of salary becomes a pure question of fact for the Court to determine. The Regulations issued by the Commissioner (Regulations 111, Section *229 29.23 (a) (6)) set up a number of conditions surrounding employment which would cast doubt upon the reasonableness and necessity of payments to employees ostensibly as salary. Among these factors which make compensation questionable are the diversion of dividends in the form of salary; an ostensible salary, being in reality payment for property; or payments made to close relatives of the taxpayer. However, it is not necessary for any one of these factors to exist in order to make the payment unreasonable. The Regulations summarize the whole question in the following sentences: The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services. * * * In any event the allowance for compensation paid may not exceed what is reasonable under all the circumstances. It is in general just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. *230 Petitioner insists that since none of these conditions surround the payment to Kirk which the Commissioner suggests as examples of conditions which would make salary payments questionable, therefore the Commissioner has exceeded his authority in questioning the salary payments to Kirk. We do not interpret the above Regulations as limiting the power of the Commissioner to question the reasonableness and necessity of salary payments only when the Commissioner finds one of the conditions set out as an example in the Regulations but that the Commissioner can take into consideration all of the circumstances surrounding the employment and pass upon the reasonableness and necessity thereof. As in all other cases, we enter the decision of this question with the presumption that the Commissioner in determining the deficiency is correct in his findings and it is incumbent upon the taxpayer through all of the evidence at the hearing to overcome that presumption. In the case at bar we have a man who was 67 years of age in 1942. He has an eighth grade education plus a two-year commercial course in high school. For 22 years prior to 1941 his earnings had not been sufficient to justify an income *231 tax return. This Court had ample opportunity to observe Kirk on the witness stand and listen to his testimony. He displayed a very vague idea of modern bookkeeping. In fact, it is questionable from the testimony whether or not he understood the difference between a cash and accrual basis and the difference between single and double entry bookkeeping. The following is an example: Q. Did you keep books for the Patton Company on a double entry system of bookkeeping or just a single entry? A. Well, the shortest way, so you don't use so much time. Cash received and cash paid, and posted it in, and slips made out every month, and you turn around and figure what it was paid out for. * * *
Q. Do you understand that there is any difference in keeping books on a cash receipts and disbursements method and on an accrual method? A. Yes. Q. Which system did you use? A. The accrual. Q. And by accrual do you mean that you recorded cash as you received it, and you recorded all your disbursements as you paid them out? A. Yes. Q. That is a cash system, isn't it? A. That is the way we keep them, but at the end of the year we lump them all together. Kirk's questionable efficiency *232 in the office is rather well reflected by the testimony of his employer, Vincent Patton: Q. What office machines did Mr. Kirk have? A. None, outside of a typewriter. There is an adding machine there, but he won't use it. Q. How does he add his figures? A. The old fashioned way. Q. What did he do on insurance? A. Well, you know there are insurance agents. They come in and want to sell you this and that kind of insurance If you let them get away with it, they will sell you something you don't want. And that insurance, I don't know anything about. "Mr. Kirk," I say, "there you are. Goodbye." And I go out. Q. Did Mr. Kirk have any responsibilities for hiring and firing any personnel? A. Absolutely. He hired three or four fellows to help him in the office, and they made things worse than if he did it himself, and he fired them. Kirk's conception of bookkeeping is well illustrated by the manner in which he handled his own compensation account: Q. How were the moneys that were paid to you under this agreement paid? Were they paid to you by check or in cash during the years 1942 and 1943? A. It was paid to me by check, and I turned around and cashed them. Q. As a matter *233 of fact, many of them were paid in cash out of large checks that were drawn to cash and used to pay various expenses, and to pay some money to you and some money to either or both of the Pattons? A. Yes. Q. Many of the checks were not drawn to pay you, but they were in amounts as high as $10,000? A. Yes. Q. And the checks were cashed and the money was used for various purposes, and the purposes were itemized and entered onto the books? A. Yes. * * *
Q. Is there an account in the ledger to which the amounts paid to you were charged, or in which the amounts paid to you were recorded? A. Not in the ledger. * * *
Q. Where is it? A. In the cash book, and from the cash book it goes over into the summary. The manner in which Mr. Kirk handled his own finances is illuminating on the question as to whether or not his services as office manager would be worth $46,049.40 to any employer. The following colloquy is interesting: Q. What did you do with the moneys that were paid to you by the Patton Company in 1942 and 1943? Did you invest them in anything? A. Why no. I didn't invest them. * * * Q. Did you deposit it in any bank? A. No. Q. Did you have any bank *234 account in 1942 or 1943? A. No. Q. How much of it did you have in War Bonds? A. Well, I couldn't say. I let the Mrs. take care of that. I don't bother with that. I was too busy doing something else. The Missus took care of that. Q. Did you have some in War Bonds? A. Yes. Q. Not more than $5,000, was it? A. I don't know how much. Q. What did you do with the balance? A. I got it. Q. What did you do with it? Where did you keep it? A. I kept it home. The above excerpts from the testimony, combined with the manner of Mr. Kirk as a witness, his diction and mannerisms, all convince the Court that he was an honest old gentleman with a very limited education and some practical experience that fitted him to do the work of an employer who either had a very small business or a business such as that of the Patton Company where one customer took the entire output, raised no question of credit, and through government inspectors practically supervised the production of its own product. There was no testimony in the record of any one other than Kirk himself and the two taxpayers as to the value of his services. There was no testimony as to what Kirk could have received from *235 any other employer similarly situated. In fact, from all the testimony in this case it is evident that the Commissioner, in allowing these taxpayers a salary deduction of $13,000 per year for Mr. Kirk's services, was very much on the generous side towards these taxpayers. In a case of this kind involving reasonableness of salary deductions, a discussion of the decisions would probably be of little profit as each case stands upon its own factual bottom. Petitioner contends that since Kirk's compensation was on a contingent basis the Courts have generally been very liberal in allowing such payments as being reasonable and necessary although they are in excess of what would ordinarily be allowed if the element of contingency were not involved. This proposition, of course, is recognized but it is questionable in the case at bar whether there was really much contingency involved in Kirk's employment. It will be noted that the contract between the Patton Supply Company and General Motors was entered into on December 17, 1940, and as a result of said contract this company, which had been operating on a very small basis, was suddenly projected into feverish activity. It is inconceivable *236 that when the Patton Company and General Motors entered into this contract the Patton Company would not be informed as to this anticipated increased production activity. The contract between Patton Company and Kirk, providing for a contingent compensation, was not entered into until January 2, 1941, over two weeks after the contract with General Motors and when all of the parties were acquainted with the anticipated increase in production. Precedents can be found among those cases involving contingent compensation for almost any contingent percentage up to 100 per cent, as in Austin v. United States, 28 Fed. (2d) 677, but in each case the Courts have gone into the circumstances surrounding the employment and have inquired into the contribution which the employee made to the contingent compensation which he received and to the contribution which the employee made to the general business of the company. In the case at bar the employee was paid ten per cent of the net sales, yet there is no evidence that he contributed one iota to the procuring of those sales. The business transactions with General Motors began in December, 1940, prior to Kirk's employment contract and the *237 record discloses that General Motors supplied work for the Patton Company as rapidly as the Patton Company could turn it out. We can find very little relationship between the efforts of Kirk and the phenomenal increase in the sales of the Patton Company. All of that increase was due to approaching was and we do not believe that an unreasonable salary created purely by war conditions not dependent upon the unusual abilities of the employee himself should form a just basis for tax reduction. In Lincoln Electric Company, 6 T.C. 37, this Court commented upon the tax needs of the country in time of war in the following words: * * * the high rates of these taxes were deliberately fixed by Congress for the purpose of increasing the public revenue to meet rapidly growing Government expenditures for military purposes by taking a great part of such abnormally high profits resulting directly or indirectly from those Government expenditures. It is therefore our conclusion that the taxpayers herein have not introduced sufficient testimony to overcome the presumption of reasonableness which attends the findings of the Commissioner in establishing the deficiencies herein. Decision *238 will be entered for the respondent. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or business expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *.↩